IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WILBERT FAMILY LIMITED       §
PARTNERSHIP, et al.,          §
                             §
                  Plaintiffs, §
                             §  Civil Action No. 3:10-CV-2052-D
VS.                          §
                             §
DALLAS AREA RAPID TRANSIT,    §
et al.,                      §
                             §
                 Defendants.  §

MEMORANDUM OPINION
AND ORDER

In this action arising from the removal of railroad tracks and discontinuation of rail

services by a public transportation agency, defendants' motion to dismiss under Fed. R. Civ.

P. 12(b)(1) and 12(b)(6) presents the questions whether plaintiffs have standing to sue,

whether their claims should be referred to the Surface Transportation Board ("STB") under

the doctrine of primary jurisdiction, and whether, as to one of plaintiffs' claims, they have

stated a claim on which relief can be granted.  For the reasons that follow, the court denies

the Rule 12(b)(1) motion, grants the Rule 12(b)(6) motion, and grants plaintiffs leave to

replead.

I

Plaintiffs Wilbert Family Limited Partnership ("Wilbert") and Central Hardwoods,

Inc. ("Central") sue defendants Dallas Area Rapid Transit and Regional Rail Right of Way

Company (collectively, "DART") alleging violations of 49 U.S.C. § 11101 of the Interstate

Commerce Commission Termination Act of 1995 ("ICCTA") and 49 C.F.R. pt. 24,[1] and

claims under 42 U.S.C. § 1983.[2]  Wilbert owns certain real property (the "Property").[3]

Formerly, there were heavy railroad main tracks adjacent to the Property and a heavy rail

turnout and spur track on the Property.  These heavy rail tracks, turnout, and spur were

located on and permanently affixed to the land long before Wilbert acquired the Property in

the 1960s.  Wilbert considered the infrastructure indispensable to the use of the Property

because the transportation advantages complemented the unique grandfathered zoning

restrictions on the Property, boosting considerably the market value of the Property and

improvements.   Central leased the Property from Wilbert to operate its business of

fabricating, planing, and delivering "lumber, plywoods, and architectural wood products."

Am. Compl. ¶ 14.  Central employed the competitive advantage of being linked to the rail

infrastructure to realize unique economies in obtaining raw materials from sawmills and

manufacturers throughout the world.

---

[1]Plaintiffs cite 49 U.S.C. ch. 24 as the basis for this claim.  Because they title the claim as a "Violation of 49 *CFR* ch. 24,"  Am. Compl. pp. 18-19 (emphasis added), the court assumes that they intend to rely on 49 C.F.R. pt. 24.

[2]The first amended complaint ("amended complaint") in two instances refers to a "*Violation of* 42 U.S.C. § 1983." Am. Compl. pp. 20, 22 (emphasis added).  Because § 1983 cannot be "violated," and because the amended complaint makes clear that plaintiffs recognize that § 1983 is a remedial provision, the court will disregard the references to a "violation" of this statute.

[3]In deciding a Rule 12(b)(6) motion to dismiss, the court construes plaintiffs' amended complaint in the light most favorable to them, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor.  *See, e.g.*, *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

When DART began constructing its Green Line light rail system, it removed the heavy rail tracks, turnout, and spur.  DART knew that Central was by far the heaviest user of rail service on the line and admitted to the Federal Transit Administration ("FTA") in its Final Environmental Impact Statement that plaintiffs would be adversely impacted by the elimination of rail service.  DART was also aware of its obligations under 49 U.S.C. § 11101 to "provide transportation to shippers or receivers located on or adjacent to its railroad lines upon reasonable request."  *Id.* at ¶ 22.

DART entered into settlement negotiations with plaintiffs beginning in 2002 regarding the loss of rail service.  DART led plaintiffs to believe that it was dealing in good faith to arrange for comparable tracks to serve the location, to locate and underwrite a new comparable facility, or to compensate for the damage.  At the time DART was discussing these options with plaintiffs, no one at DART questioned whether it was obligated to compensate plaintiffs.  It was DART's understanding that it "had to come up with an option to continue service to them somehow," with the only question being in what manner.  *Id.* at ¶ 21.

As the negotiations proceeded, however, DART came to realize that the costs of providing alternatives for plaintiffs would be greater than anticipated.  It instituted, in the words of one DART consultant, a "de facto abandonment" in which it "danced around the issues of abandonment by dealing with customers so that no complaint actions c[a]me up." *Id.* at ¶ 23.  According to plaintiffs, this meant that DART had no real intention to accommodate plaintiffs after it realized the true cost of providing alternatives, and that

DART continued negotiations with plaintiffs merely as a part of a stall-and-delay tactic in order to ignore its lawful obligation to provide fair compensation. Plaintiffs allege that, if DART had wanted to discontinue service to them, it was required under federal law to take certain procedural steps to effect the abandonment of the rail line and service provided to plaintiffs, such as obtaining authorization from the STB, but it failed to do so. Around November 2009, after seven years of negotiations, DART reneged its prior representations and informed plaintiffs that it did not have any legal obligation to provide compensation or relocation. The loss of track resulted in significant devaluation of the Property and lost customers and accounts for Central.

Each plaintiff alleges three claims against DART: first, a violation of § 11101 of the ICCTA, based on a failure to provide transportation and service without having been properly relieved of its statutory obligations; second, a violation of 49 C.F.R. pt. 24, by failing to comply with an FTA Record of Decision and associated federal laws and regulations requiring DART to address, minimize, and redress the costly impact on plaintiffs due to the cessation of rail service;[4] and, third, violations of the Fifth and Fourteenth Amendments, remediable under 42 U.S.C. § 1983, on the ground that DART denied their property rights and damaged their real property interests without due process.

DART moves to dismiss under Rule 12(b)(1) and Rule 12(b)(6). It maintains that, under the ICCTA, the STB has jurisdiction over railroad transportation by rail carriers as part

---

[4]Plaintiffs do not specify which provisions of 49 C.F.R. pt. 24 DART allegedly violated.

of the interstate rail network, that the ICCTA provides an administrative process for complaints of violations of the ICCTA, and that complaints must be filed with the STB. DART therefore posits that this action must be dismissed because the STB has primary jurisdiction over plaintiffs' claims of violations of § 11101, and plaintiffs failed to refer their claims to the STB. Alternatively, DART contends the case should be stayed pending the outcome of the STB's decision. DART also maintains that plaintiffs lack standing to sue for violations of § 11101 because they only shipped lumber or wood products, which are commodities that are exempt from regulations under the ICCTA. Plaintiffs oppose the motion, asserting that the doctrine of primary jurisdiction should not be invoked and that they have standing to sue.

## II

The court considers first DART's Rule 12(b)(1) motion.

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Id.* The plaintiff has the burden of proving subject matter jurisdiction by a preponderance of the evidence. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008).

DART presents only two arguments in support of its motion to dismiss: the doctrine of primary jurisdiction and lack of standing. Neither argument, however, challenges the court's subject matter jurisdiction.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must meet both constitutional and prudential requirements.  *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001).  Of the two, courts have only treated *constitutional* standing as a Rule 12(b)(1) issue pertaining to subject matter jurisdiction.  *See, e.g.*, *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (citing *Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 409 (5th Cir. 2008)).  "[A] dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." *Id.*

Constitutional standing requires that a litigant allege three elements: (1) injury in fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendant's actions; and (3) the likelihood of redressability.  *See, e.g., Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).  DART does not raise any arguments specific to plaintiffs' constitutional standing, and the court's independent evaluation[5] results in the conclusion that plaintiffs have clearly satisfied the constitutional requirements of standing.  They have alleged economic injuries to real property and to business that have already occurred as a direct result of DART's discontinuation of rail

---

[5]The court must assess independently whether it has constitutional standing. *See, e.g., Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 & n.1 (5th Cir. 2002) (noting that constitutional standing issues must be considered at the outset, even if the court must raise them *sua sponte*, "because it determines the court's fundamental power even to hear the suit").

service, and these injuries appear to be redressable by appropriate remedy.[6]  DART does not

dispute the fact of injury, causation, and redressability in itself; instead, it challenges standing

on the basis that the products at issue are exempt from the requirements of the ICCTA.  But

"[t]his question of whether or not a particular cause of action authorizes an injured plaintiff

to sue is a merits question, affecting statutory standing, not a jurisdictional question, affecting

constitutional standing."  *See Blanchard 1986*, 553 F.3d at 409.

"[T]he doctrine of primary jurisdiction 'is not related to the subject matter jurisdiction

of the district court over the underlying action.'"  *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796,

809 (5th Cir. 2011) (alteration omitted) (quoting *S. New Eng. Tel. Co. v. Global NAPs Inc.*,

624 F.3d 123, 136 (2d Cir. 2010)); *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993)

("Referral of the issue to the administrative agency does not deprive the court of

jurisdiction[.]").  Instead, application of the primary jurisdiction doctrine "presumes original

federal subject matter jurisdiction."  *Elam*, 635 F.3d at 809 (emphasis omitted).

Therefore, DART is not entitled to dismissal of this lawsuit under Rule 12(b)(1) based

on lack of prudential or statutory standing or under the doctrine of primary jurisdiction,

---

[6]In this circuit, it is well settled that subject matter jurisdiction determinations, unlike summary judgment decisions, may be made using any one of the following bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  In evaluating jurisdiction, the district court must resolve disputed facts without giving a presumption of truthfulness to the plaintiff's allegations.  *See id.*  Because the facts underlying the determination of subject matter jurisdiction are alleged in plaintiffs' amended complaint and are undisputed, the court accepts them as true.

neither of which calls into question this court's subject matter jurisdiction.

### III

The court turns next to DART's motion under Rule 12(b)(6) to dismiss plaintiffs' ICCTA claim under § 11101[7] based on the doctrine of primary jurisdiction.[8]

### A

"The doctrine of primary jurisdiction attempts to maintain 'proper relationships between the courts and administrative agencies' by suspending judicial process pending the 'referral' of certain issues to an administrative agency for its views." *Elam*, 635 F.3d at 809 (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956)). It "comes into play when a court and an administrative agency have concurrent jurisdiction over the same matter, and no statutory provision coordinates the work of the court and of the agency." *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1091 (5th Cir. 1973); *see also, e.g., W. Pac.*

---

[7]Although DART appears to move under Rule 12(b)(6) to dismiss all of plaintiffs' claims, it has articulated no arguments for the dismissal of plaintiffs' causes of action under 49 C.F.R. pt. 24 and 42 U.S.C. § 1983. Rather, DART's two arguments—based on the primary jurisdiction doctrine and the regulatory exemption—are directed solely to plaintiffs' ICCTA claim under § 11101.

[8]Although DART characterizes its regulatory exemption argument as a challenge to plaintiffs' standing, it is more aptly treated as a contention that plaintiffs have failed to state a claim on which relief can be granted. DART maintains that there is an exemption that controls plaintiffs' right to recover under § 11101 of the ICCTA. This is a merits-based ground for dismissal, not a challenge to plaintiffs' standing. *See, e.g., Ruiz v. Estelle*, 161 F.3d 814, 829 n.22 (5th Cir. 1998) ("Prudential standing limitations help courts identify proper questions for judicial adjudication, and further define the judiciary's role in the separation of powers."); *Procter & Gamble*, 242 F.3d at 560 (observing that prudential standing requirements are "an integral part of 'judicial self-government'" and are "judicially created limits").

*R.R.*, 352 U.S. at 63-64 ("'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]") (quoting *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940)).  While "[n]o fixed formula exists," agency referral is favored when "(a) it will promote even-handed treatment and uniformity in a highly regulated area, or when sporadic action by federal courts would disrupt an agency's delicate regulatory scheme; or (b) the agency possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Elam*, 635 F.3d at 811 (alteration in original) (citing *W. Pac. R.R.*, 352 U.S. at 64, and *Mercury Motor*, 475 F.2d at 1092).  "[T]he doctrine of primary jurisdiction is not a doctrine of futility." *Id.* (quoting *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Jewel Tea Co.*, 381 U.S. 676, 686 (1965)).  The court need not refer a matter to "'an expensive and merely delaying administrative proceeding' when there are no substantial issues for the agency to decide." *Id.* (quoting *Jewel Tea*, 381 U.S. at 686).  If referral is appropriate, the court "has discretion either to retain jurisdiction while the action is [referred] to the agency or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* (alterations omitted) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993)).

B

The court begins by examining whether this court and the STB have concurrent jurisdiction.  Despite an apparent conflict between 49 U.S.C. § 10501(b), which specifies that

the STB's jurisdiction over transportation by rail carriers, or abandonment or discontinuance of certain types of track, is "exclusive," and 49 U.S.C. § 11704(c)(1), which permits a party either to "file a complaint with the [STB] or bring a civil action under subsection (b) of this section[9] to enforce liability against a rail carrier," several courts have resolved this by concluding that district courts have concurrent jurisdiction over actions falling within § 11704(c)(1).  *See, e.g., Elam*, 635 F.3d at 811 ("We will not presume Congress intended § 10501(b) to withdraw original federal jurisdiction over claims arising under the ICCTA, particularly when such jurisdiction was commonly exercised under the similarly worded [Interstate Commerce Act ('ICA')];" "In fact, we think the doctrine of primary jurisdiction provides the best way to reconcile §§ 10501(b) and 11704(c)(1)."); *Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co.*, 215 F.3d 195, 205 (1st Cir. 2000) ("*Pejepscot II*") (in light of legislative history and practice under ICA, resolving conflict between statutes in favor of concurrent jurisdiction under § 11704(c)(1), including over plaintiff's § 11101 claim); *Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 750 F.Supp.2d 189, 197 (D. Me.

---

[9]Subsection (b) states:

> [a] rail carrier providing transportation subject to the jurisdiction of the [STB] under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part. A rail carrier providing transportation subject to the jurisdiction of the [STB] under this part is liable to a person for amounts charged that exceed the applicable rate for the transportation.

49 U.S.C. § 11704(b).

2010) (holding under *Pejepscot II* that § 11704(c)(1) provides cause of action and that jurisdiction is proper in federal court). Because the court has concurrent jurisdiction over plaintiffs' ICCTA claim, it considers next whether the claim should be referred to the STB under the doctrine of primary jurisdiction. *See Elam*, 635 F.3d at 811.[10]

As reflected in plaintiffs' first amended complaint ("amended complaint"), the facts of this case are straightforward. Plaintiffs allege that they used certain trackage to transport certain lumber or wood products and that DART removed the tracks. DART's only merits-based challenge to the § 11101 claim presents a question of law: whether lumber or wood products are exempt under 49 C.F.R. § 1039.11 (2012) from the rail service requirements of § 11101(a). Legal issues need not be referred to agencies, however, since they

> involv[e] neither the agency's particular expertise nor its fact finding prowess; the standards to be applied in resolving the issue are within the conventional competence of the courts and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the case.

*Columbia Gas Transmission Corp. v. Allied Chem. Corp.*, 652 F.2d 503, 519 n.15 (5th Cir. Aug. 1981) (holding that referral was necessary on only one issue because the other disputed issues were legal, not factual, and that one issue had been decided by the court). Moreover,

---

[10]DART relies on the following factors adopted by the First Circuit in *Pejepscot II*: "(1) whether the agency determination lies at the heart of the task assigned the agency by Congress; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." *Pejepscot II*, 215 F.3d at 205 (brackets omitted) (citing *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995)).

although rail transportation is a highly regulated area of law, resolving this issue in this forum is unlikely to threaten uniformity or disrupt a delicate regulatory scheme. The STB has held that "exemption of a commodity . . . generally excuses carriers from virtually all aspects of regulation involving the transportation of that commodity," "includ[ing] the dual requirements that a carrier furnish rates and provide service on reasonable request pursuant to those rates." *See Pejepscot Indus. Park, Inc.*, 2003 WL 21108198, *4 (S.T.B. May 15, 2003) ("*Pejepscot III*"). In adhering to STB precedent, this court is unlikely to threaten uniformity or disrupt the STB's regulatory scheme. And even if the STB has expertise in a specialized area with which the courts are relatively unfamiliar (i.e., rail transportation regulation), this court is no less competent than the STB to resolve the particular, narrow statutory and regulatory issue in dispute in this case. Because there are no substantial issues for the STB to decide, it is more consistent with the principle that the primary jurisdiction doctrine is not a "doctrine of futility" for this court to decide this issue than to defer to a possibly "expensive and merely delaying administrative proceeding" for the STB to reexamine an already resolved issue. *See Elam*, 635 F.3d at 811.[11]

_____

[11]DART maintains that, in *Pejepscot II,* the First Circuit referred the ICCTA claim under § 11101(a) to the STB because "the STB's expertise is clearly involved in the question of whether [defendant's] actions constitute unlawful refusal to 'provide . . . service on reasonable request,'" "the agency's determination would materially aid the district court," and "referral to the STB will promote uniformity in the standards governing refusals to provide service." *Pejepscot II*, 215 F.3d at 205-06 (alteration in original; citation omitted). The court concludes that the decision in *Pejepscot II* to refer the ICCTA claim to the STB can be distinguished on two grounds. First, unlike the district court in *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.*, 59 F.Supp.2d 109 (D. Me. 1999) ("*Pejepscot I*"), this court has the benefit of the STB's final decision in *Pejepscot III* regarding the effect of

IV

The court now considers DART's contention that plaintiffs' claims under § 11101 of the ICCTA are precluded by the exemption found in 49 C.F.R. § 1039.11(a).

A

Pursuant to its authority under 49 U.S.C. § 10502(a),[12] the ICC (STB's predecessor)

---

exemptions. *See Pejepscot III*, 2003 WL 21108198, at *4. Second, it was necessary for the STB to consider in *Pejepscot III* an additional issue not presented in this case: because the exemption of one commodity—automobile shredder residue ("ASR")—was effective in 1998 and plaintiff requested rates for the movement of ASR at least in 1996 (i.e., before the effective date of the exemption), it was necessary for the STB to determine whether plaintiff's pre-exemption request as to ASR triggered defendants' § 11101 obligations, and, if so, whether defendants satisfied these obligations. *Id.* at *4-6. This court need not decide whether DART has fulfilled its responsibilities under § 11101; if the exemption applies, as the court concludes it does, all activity between plaintiffs and DART occurred after all lumber or wood products under Standard Transportation Commodity Code ("STCC") No. 24 were exempted in 1993. *See Rail Gen. Exemption Auth.—Petition of AAR to Exempt Rail Transp. of Selected Commodity Grps.*, 58 Fed. Reg. 53433-01, at 53433 to 34 (Oct. 15, 1993) (codified in 49 C.F.R. § 1039.11).

[12]49 U.S.C. § 10502(a):

> (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the [STB] under this part, the [STB], to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the [STB] finds that the application in whole or in part of a provision of this part—
>> (1) is not necessary to carry out the transportation policy of section 10101 of this title; and
>> (2) either—
>>> (A) the transaction or service is of limited scope; or
>>> (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse

- 13 -

first exempted in 1991 certain lumber or wood products from the provisions of the ICA (the ICCTA's predecessor statute).  *See Rail Gen. Exemption Auth.—Lumber or Wood Prods.*, 7 I.C.C. 2d 673, 673 (I.C.C. 1991) (exempting "24 2," "24 3," "24 91," and "24 116," with exceptions) ("*Lumber or Wood Products I*"), *Rail Gen. Exemption Auth.—Lumber and Wood Prods.*, 56 Fed. Reg. 31546-02, at 31546 (July 11, 1991) (codified in 49 C.F.R. § 1039.11) (same) ("*Lumber and Wood Products II*").  In 1993, the ICC expanded the exemption to include all lumber or wood products under Standard Transportation Commodity Code ("STCC") No. 24.  *See Rail Gen. Exemption Auth.—Petition of AAR to Exempt Rail Transp. of Selected Commodity Grps.*, 9 I.C.C.2d 969, 969-71, 985 (I.C.C. 1993) (specifically approving exemption of "24 1" and "24 4," with exceptions, and providing that all lumber or wood products in STCC No. 24 would be listed in final exemptions to be codified in § 1039.11) ("*Petition of AAR I*"); *Rail Gen. Exemption Auth.—Petition of AAR to Exempt Rail Transp. of Selected Commodity Grps.*, 58 Fed. Reg. 53433-01, at 53433 to 34 (Oct. 15, 1993) (codified in 49 C.F.R. § 1039.11) (same) ("*Petition of AAR II*").  As a result, 49 C.F.R. § 1039.11(a) provides, in relevant part: "Except as indicated in paragraph (b) of this section, the rail transportation of the commodities listed below [i.e., a list that includes STCC No. 24 "Lumber or wood products"] is exempt from the provisions of 49 U.S.C. subtitle IV," *id.*, which includes 49 U.S.C. § 11101.  An "exemption of a commodity under 49 U.S.C. 10502 generally excuses carriers from virtually all aspects of regulation involving the transportation

of market power.

of that commodity," "includ[ing] the dual requirements [under 49 U.S.C. § 11101] that a carrier furnish rates and provide service on reasonable request pursuant to those rates." *Pejepscot III*, 2003 WL 21108198, at *4. "Thus, even if a carrier's conduct would constitute a statutory violation during a period of regulation, the exemption bars regulatory relief during the period when the exemption is in force." *Id.*

Plaintiffs allege that Central used the rail to receive shipments of certain raw materials to fabricate, plane, and deliver "lumber, plywoods, and architectural wood products." Am. Compl. ¶ 14. As the amended complaint is framed, these products fall squarely within the commodity exemption under § 1039.11(a) for lumber or wood products. Plaintiffs do not assert that they used the rail track, turnout, or spur for any non-exempt product. Nor do they aver that an exception under § 1039.11(b)[13] applies. And § 1039.11(b) does not appear on its face to permit this reading.

## B

Despite the expansive language in 49 C.F.R. § 1039.11 and *Pejepscot III*, plaintiffs maintain on a number of grounds that this regulatory exemption does not extend to their claim under 49 U.S.C. § 11101. They posit several arguments in favor of the general contention that the exemption of lumber or wood products from the "tariff-keeping requirements" of title 49 does not remove DART's obligation to provide heavy rail service

---

[13]Subsection (b) provides that exempted carriers must comply with the STB's accounting and reporting requirements, and that tariffs will no longer apply to the exempted commodities. *See* 49 C.F.R. § 1039.11(b).

*in toto*.  Ps. Br. 10.  The court considers each in turn.

First, citing part of 49 C.F.R. § 1039.11(a) and *Lumber or Wood Products I* in support, plaintiffs read the regulatory exemption narrowly to affect only "tariff and rate-posting requirements previously mandated by federal law."  Ps. Br. 11.  Section 1039.11(a), after stating that lumber or wood products are exempt from the provisions of 49 U.S.C. subtitle IV, provides, in relevant part:

> Excluded from this exemption are any movements for which a finding of market dominance has been made.  However, this exemption shall not be construed as affecting in any way the existing regulations, agreements, prescriptions, conditions, allowances or levels of compensation regarding the use of equipment, whether shipper or railroad owned or leased, including car hire, per diem and mileage allowances, and also including exemption from the anti-trust laws necessary to negotiate car service regulations or mandatory interchange of equipment or to maintain and execute such agreements.

*Id.*  Nothing in the cited language of § 1039.11(a) suggests that the lumber or wood exemption is inapplicable to the lumber and wood rail transportation at issue.  Plaintiffs neither allege a finding of market dominance with regard to the rail transportation of lumber or wood products, nor do they complain of violations of existing regulations, agreements, conditions or the like regarding the use of equipment.  Plaintiffs' reliance on *Lumber or Wood Products I* is also misplaced.  In this decision, the ICC addressed a request for a general exemption for certain lumber or wood products from "all provisions of Subtitle IV of Title 49 (49 U.S.C. §§ 10101a-11917)."  *Lumber or Wood Products I*, 7 I.C.C.2d at 679.  The ICC's approach was to grant the general exemption, while expressly noting the few

regulations that would be left untouched by the exemption: car hire, car service, and Class III protections regarding joint rates on traffic moving in boxcars. *See id.* at 673. None of these regulations appears relevant here, and plaintiffs do not contend otherwise.

Second, plaintiffs note that the ICC in *Lumber or Wood Products I* did not specifically mention that rail carriers are exempt from the ICA's requirements regarding abandonment, suggesting that these requirements still attach to lumber or wood products. They further contend that if the regulatory exemption extends to rail abandonment regulations, it would be "completely at odds with the fact that the STB and federal courts continue to wield jurisdiction as to whether a rail carrier will be allowed to abandon service." Ps. Br. 11 (emphasis omitted). The court concludes, however, that the failure to discuss the abandonment requirements is a clear indication that such regulations are *included* in the general exemption because the ICC specified the fields that remain regulated. *See Lumber or Wood Products I*, 7 I.C.C.2d at 673; *see also* 49 C.F.R. § 1039.11. And the decisions that plaintiffs cite in support relate to circumstances in which a defendant abandoned rail services for nonexempt products and are therefore inapposite. *See Kulmer v. STB*, 236 F.3d 1255, 1256 (10th Cir. 2001) (reviewing STB's decision to dismiss plaintiff's offer to purchase railroad line during abandonment process, but containing no discussion of exempted commodities); *GS Roofing Prods. Co. v. STB*, 143 F.3d 387, 389-91, 394 (8th Cir. 1998) (reversing STB's denial of damages incurred during railroad's embargo of line in context unrelated to exempted commodities).

Third, plaintiffs contend that, in *Granite State Concrete Co. v. Boston & Maine Corp.*,

2003 WL 22121645 (S.T.B. Sept. 15, 2003), the STB "refused to find that the deregulation of product tariff and recordkeeping requirements under [49 C.F.R. § 1039.11] removed the requirement to provide service" under 49 U.S.C. § 11101. Ps. Br. 12. The court disagrees with this reading of *Granite State*. In *Granite State* the STB assumed, without deciding, that an exemption applied to the transportation and service at issue, and it revoked the exemption pursuant to its authority under 49 U.S.C. § 10502(d) for purposes of the proceeding because one of the plaintiffs "lack[ed] the competitive service options that were the basis for the original class exemption." *Granite State*, 2003 WL 22121645, at *5. Wilbert and Central shared with the *Granite State* plaintiffs the opportunity to request the revocation of an exemption. *See* 49 U.S.C. § 10502(d) ("The Board may revoke an exemption, to the extent it specifies, when it finds that application in whole or in part of a provision of this part to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title."). But as the amended complaint is pleaded, there is no suggestion that plaintiffs did so for their lumber or wood products, and *Granite State* is therefore inapposite.

Fourth, plaintiffs contend that 49 U.S.C. § 10502(a), which empowered the ICC (and now the STB) to grant exemptions, does not support this lumber or wood exemption because it authorizes exemptions only if regulation "is not necessary to carry out the transportation policy of section 10101 of this title." *See* 49 U.S.C. § 10502(a). They maintain that one aspect of the transportation policy is the provision of rail service itself.[14] But § 10101 does

---

[14]In support, plaintiffs cite language in *Menasha Paper Co. v. Chicago & Northwestern Railway Co.*, 241 U.S. 55 (1916), that provides that the Hepburn Act "requires

not state that providing rail service itself is in all circumstances a policy objective of the United States.  At best, § 10101(4) provides that it is government policy "to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense."  *Id.*  The ICC has already weighed the many competing policy objectives listed in § 10101 and determined that exempting lumber and wood products from regulation would significantly further several objectives of federal rail transportation policy, and plaintiffs have demonstrated no basis to disregard that determination.  *See Lumber or Wood Products I*, 7 I.C.C.2d at 675 ("Several objectives of the Rail Transportation Policy of § 10101a . . . will be furthered directly by this exemption [for certain lumber or wood products since it will] encourage competition and competitively-determined rate levels, minimize Federal regulation, promote efficiency, allow adequate returns and foster sound economic conditions in the industry, and eliminate noncompensatory rates."); *Lumber and Wood Products II*, 56 Fed. Reg. at 31546-47 (holding that exemption for certain lumber and wood products complies with § 10505 because it "will promote the pro-competitive and efficiency goals of the rail transportation policy," shippers are protected from abuse of market power because there is sufficient intermodal, intramodal, and geographic competition, and it will "eliminate the duplicative and burdensome system" for unregulated boxcars but

---

railroad companies to provide and furnish transportation to shippers upon reasonable request."  *Id.* at 58.  But this reliance is misplaced because *Menasha* predates the commodity exemptions.

regulated flatcars); *Petition of AAR I*, 9 I.C.C.2d at 973 (concluding that exemption for remainder of STCC No. 24 lumber and wood products would promote transportation policy in accordance with § 10505 by minimizing need for federal regulatory control, promoting adequate revenues, increasing competition, allowing more efficient management, and encouraging energy conservation, and noting that other provisions of national transportation policy would not be adversely affected).

In sum, plaintiffs have provided no basis for narrowly construing the effect of the exemption to economic regulations, such as tariff requirements.  Accordingly, the court holds that plaintiffs have failed to state a claim under 49 U.S.C. § 11101 on which relief can be granted, and the claim is dismissed.

V

Although the court is dismissing plaintiffs/ § 11101 claim, it will permit plaintiffs to replead.  *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.") (internal quotation marks and citation omitted).  Because plaintiffs have not stated that they cannot, or are unwilling to, cure the defects that the court has identified, the court grants plaintiffs 30 days from the date this memorandum opinion and

order is filed to file an amended complaint.[15]

\*   \*   \*

For the reasons explained, the court denies DART's motion to dismiss under Rule 12(b)(1), grants its motion to dismiss under Rule 12(b)(6) as to plaintiffs' claims under 49 U.S.C. § 11101, and grants plaintiffs 30 days from the date this memorandum opinion and order is filed to file an amended complaint.[16]

**SO ORDERED.**

January 26, 2012.

SIDNEY A. FITZWATER
CHIEF JUDGE

---

[15]The court does not suggest that it would reach the same conclusion regarding the issue of primary jurisdiction regardless of the nature of the claims asserted in the second amended complaint.

[16]The court notes that there are other claims that remain to be adjudicated because DART has not adequately addressed them on the merits under Rule 12(b)(6).